Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                Plaintiffs,

        -against-

MOTION MEDICAL DIAGNOSTICS, P.C.,
RICHARD C. KOFFLER, M.D., SARI RAUCH
a/k/a SARI EDELMAN a/k/a SARI EDELMAN
RAUCH, JEFFREY RAUCH, and A.H.S.
MANAGEMENT & MARKETING COMPANY, INC.,

                                Defendants.

-------------------------------------------------------------------X

Docket No.: _____(        )

**Plaintiff Demands a Trial
by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the defendants, Motion Medical Diagnostics, P.C.,

Richard C. Koffler, M.D., Sari Rauch a/k/a Sari Edelman a/k/a Sari Edelman Rauch, Jeffrey Rauch

and A.H.S. Management & Marketing Company, Inc. (collectively "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $702,900.00 that the Defendants wrongfully obtained from GEICO, and further seeks to extinguish more than $2,230,000.00 in pending fraudulent billing resulting from the Defendants' submission of thousands of fraudulent charges relating to medically unnecessary and otherwise non-reimbursable diagnostic services, specifically bogus range of motion and muscle strength tests ("ROM/MT" or the "Fraudulent Services") that were purportedly rendered to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance that were issued by GEICO ("Insureds").

2.      The Defendants submitted billing for the Fraudulent Services under the name of Motion Medical Diagnostics P.C. ("Motion Medical PC"), a New York professional corporation nominally owned on paper by Defendant Richard C. Koffler, M.D. ("Dr. Koffler"). Motion Medical PC purports to be a legitimate medical professional corporation, but Dr. Koffler resides in Florida, has not personally provided any medical services or treated patients through Motion Medical PC, and has not truly owned and/or controlled Motion Medical PC.

3.      Motion Medical PC instead operates under the illegal control of non-physicians Jeffrey Rauch ("Jeffrey Rauch") and Sari Rauch a/k/a Sari Edelman a/k/a Sari Edelman Rauch ("Sari Rauch"), who together with A.H.S. Management & Marketing Company, Inc. ("AHS Management & Marketing") operate Motion Medical PC on a transient basis, providing no legitimate or medically necessary services to the Insureds.

2

4.      The Defendants, using Motion Medical PC, initially exploited New York's No-Fault insurance system for financial gain by purportedly rendering the Fraudulent Services in the form of medically unnecessary and illusory range of motion and muscle strength tests on patients at the offices of other healthcare providers obtained through illegal fee-splitting and kickback arrangements.   The Defendants more recently have continued their fraudulent scheme by disguising Motion Medical PC's reports for the Fraudulent Services with superficial but ultimately meaningless information in a purposeful effort to circumvent recent reimbursement restrictions regarding ROM/MT that were enacted to eliminate fraud and abuse.

5.      By this action, GEICO seeks recovery of the substantial sums stolen from it by the Defendants, along with a declaration that it is not legally obligated to pay reimbursement of more than $2,230,000.00 in pending No-Fault insurance claims that have been submitted to GEICO by or on behalf of Motion Medical PC, because:

    (i)     the Defendants submitted claims on behalf of Motion Medical PC for Fraudulent Services that were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent testing and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds;

    (ii)    Motion Medical PC is unlawfully owned and/or controlled by unlicensed laypersons;

    (iii)   Motion Medical PC has been nominally owned on paper by a physician who does not practice medicine through the professional corporation;

    (iv)    the Defendants engaged in illegal fee-splitting, kickback, and referral arrangements as part of a scheme to defraud New York automobile insurers; and

    (v)     the Defendants submitted claims on behalf of Motion Medical PC using billing codes that misrepresented and exaggerated the types of services that were purportedly rendered in order to: (i) inflate the charges submitted to

GEICO; and (ii) purposely circumvent the fee schedule's reimbursement restrictions and prohibitions applicable to the Fraudulent Services.

6.      The Defendants fall into the following categories:

(i)      Motion Medical PC is a fraudulently incorporated New York professional corporation through which the Fraudulent Services were purportedly performed and billed to insurance companies, including GEICO.

(ii)     Dr. Koffler is a licensed medical professional who falsely purports to own and control Motion Medical PC in order to enable the submission of billing for the Fraudulent Services through the name of Motion Medical PC.

(iii)    Jeffrey Rauch and Sari Rauch are non-physicians who, using AHS Management & Marketing (collectively the "Management Defendants") secretly and unlawfully control and derive economic benefit from Motion Medical PC. Through their unlawful control of Motion Medical PC, the Management Defendants conspired to pay kickbacks for patient referrals, facilitated illegal fee-splitting and financial arrangements, and caused Insureds to be subjected to the Fraudulent Services pursuant to a predetermined fraudulent testing and billing protocol designed to maximize profits without regard to genuine patient care.

7.      As discussed further below, the Defendants at all relevant times herein have known that: (i) the Fraudulent Services are not medically necessary and are provided – to the extent that they are provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds; (ii) Motion Medical PC is unlawfully owned and/or controlled by non-physicians; (iii) Motion Medical PC is nominally owned on paper by Dr. Koffler, who does not practice medicine through the professional corporation; (iv) the Defendants engage in illegal fee-splitting, kickback, and referral arrangements as part of a scheme to defraud New York automobile insurers; (v) the Defendants use billing codes that misrepresent and exaggerate the types of services purportedly rendered in order to inflate the charges submitted to GEICO; and (vi) the Defendants purposefully misrepresent the Fraudulent

Services in order to circumvent the reimbursement restrictions and prohibitions applicable to the Fraudulent Services.

8.      As such, the Defendants did not, and do not now have, any right to be compensated for the Fraudulent Services that have been billed to GEICO through Motion Medical PC.

9.      The chart annexed hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

10.     The Defendants' fraudulent scheme commenced in or around 2019 and continues to the present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $702,900,00.

## THE PARTIES

### I.      Plaintiffs

11.     Plaintiffs   Government   Employees   Insurance   Company,   GEICO   Indemnity Company,   GEICO   General   Insurance   Company   and   GEICO   Casualty   Company   are   Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Defendant Motion Medical PC is a New York professional corporation fraudulently incorporated on or about August 29, 2019 with its current principal place of business located at 44 Bethpage Road, Suite 3, Hicksville, New York, 11801.

13.     Motion Medical PC is the vehicle through which the Defendants have submitted fraudulent billing to GEICO and other insurers.

14.    Defendant Dr. Koffler resides in and is a citizen of Florida. Dr. Koffler was licensed to practice medicine in New York on July 2, 1996, and purports to own Motion Medical PC.

15.    Dr. Koffler previously was a named defendant in a federal affirmative fraud litigation captioned <u>GEICO Ins. Co., et al. v. Bi County Medical Diagnostics, et al.</u>, 2:18-cv-03649(DRH)(ARL) (E.D.N.Y. 2018) (the "<u>Bi County</u> case"). The allegations in the <u>Bi County</u> case were similar to those contained herein, in that Dr. Koffler was alleged to be the sham owner of two medical professional corporations, Island Medical Diagnostics, PLLC and Apollo Medical Diagnostics, PLLC, which operated similarly to Motion Medical PC and submitted fraudulent billing for ROM/MT.

16.    Defendant Sari Rauch resides in and is a citizen of New York and is the spouse of Defendant Jeffrey Rauch. Sari Rauch is not a licensed medical doctor.

17.    Defendant Jeffrey Rauch resides in and is a citizen of New York and is the spouse of Defendant Sari Rauch. Jeffrey Rauch is a licensed chiropractor but is not and never has been a licensed medical doctor.

18.    Jeffrey Rauch was the subject of a disciplinary action brought by the New York State Board of Regents in December 2007, in which he admitted to being convicted of insurance fraud in the fifth degree. The Board of Regents imposed a one-month license suspension, a 23-month stayed suspension, two years of probation, and a monetary penalty.

19.    Defendant AHS Management & Marketing is a New York corporation incorporated on or about December 4, 2018, with its current principal place of business located at 44 Bethpage Road, Hicksville, New York, 11801.

20.     AHS Management & Marketing maintains its principal place of business in the same office building as Motion Medical PC and is used by the Management Defendants to assist with their illegal ownership and control of Motion Medical PC, and to siphon insurance profits generated by Motion Medical PC to the Management Defendants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

24.     GEICO underwrites automobile insurance in New York.

25.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

27. An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within 45 days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as a "HCFA-1500" form).

28. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (i.e., the Fee Schedule).

29. When a healthcare provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

30.     Pursuant to the No-Fault Laws, a healthcare provider is not eligible to bill for or to collect No-Fault Benefits if it is unlawfully incorporated or fails to meet any New York State or local licensing requirement necessary to provide the underlying services.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis added).

32.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

33.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

34.     Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

35.     Lawful licensure of a New York professional corporation requires that the owner(s) of the professional corporation be engaged in the practice of their authorized profession through their professional corporation. <u>See</u> New York Business Corporation Law § 1507(a).

36.     Thus, the licensed medical professional owner(s) of a healthcare professional corporation must practice medicine through their healthcare professional corporation. The "practice of medicine" is defined as "diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." New York Education Law § 6521.

37.     New York law also prohibits licensed healthcare providers from paying or accepting payments (i.e., kickbacks) in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a, 6531.

38.     Furthermore, pursuant to New York Education Law § 6512, § 6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

39.     Pursuant to Education Law § 6509-a, a licensee shall not "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee. Further, pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is prohibited from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services. Pursuant to Education Law § 6530(19), a licensee shall not permit any person to share in fees for professional services.

40.     New York law also prohibits anyone from engaging in for profit, any business or service which in whole or in part includes the referring or recommending of persons to a physician, hospital, health-related facility, or dispensary for any form of medical care or treatment. See New York Public Health Law § 4501.

41.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, engages in unlawful fee-splitting, pays or receives unlawful kickbacks in exchange for patient referrals, shares fees for professional services with unlicensed persons, and/or if it is owned by licensed professionals who do not engage in the practice of their profession through their professional corporation.

42.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO and to all other automobile insurers must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   The Defendants' Fraudulent Scheme

### A.     An Overview of the Fraudulent Scheme

43.     Beginning in or around 2019, and continuing uninterrupted through the present day, Dr. Koffler and the Management Defendants have colluded to orchestrate and execute a complex fraudulent scheme in which Motion Medical PC – owned on paper by Dr. Koffler, but actually illegally owned, controlled, and operated by the Management Defendants – has been used to bill GEICO and other New York automobile insurers millions of dollars in fraudulent billing for

medically unnecessary, illusory, and otherwise non-reimbursable services (i.e., the Fraudulent Services) resulting in the payment of No-Fault Benefits that the Defendants were never entitled to receive.

44.    Motion Medical PC purports to be a legitimate medical professional corporation, but it operates on a transient basis, maintaining no stand-alone practice of its own, having no patients of its own, and providing no legitimate or medically necessary services to GEICO's Insureds.

45.    The Fraudulent Services billed through Motion Medical PC to GEICO, totaling more than $3.2 million billed to GEICO alone, consist of purported ROM/MT rendered to Insureds that is both unnecessary and provided – to the extent provided at all – pursuant to fraudulent and predetermined protocols designed solely to financially enrich the Defendants, rather than to treat, diagnose, or otherwise benefit Insureds.

46.    The Management Defendants operate Motion Medical PC on an itinerant basis at a series of healthcare office clinics (collectively the "Clinics") where they are provided access to Insureds who they can subject to the Fraudulent Services, in exchange for kickbacks or other financial incentives negotiated by the Defendants.

47.    As described more fully below, the Defendants' fraudulent scheme involves: (i) the use of Dr. Koffler's license to illegally incorporate, own, and/or control Motion Medical PC; (ii) engaging in illegal referral, kickback, and/or fee-splitting arrangements; (iii) implementing a fraudulent testing and billing protocol designed to maximize profits rather than to benefit Insureds; (iv) using Motion Medical PC as a conduit to submit fraudulent No-Fault billing to GEICO and other New York automobile insurers pursuant to the predetermined fraudulent billing protocol;

and (v) using Motion Medical PC to egregiously circumvent the Fee Schedule's reimbursement restrictions and prohibitions pursuant to the predetermined fraudulent billing protocol.

### B.   The Defendants' Fraudulent Incorporation, Ownership, and Operation of Motion Medical PC

48.   To effectuate their fraudulent scheme, the Management Defendants colluded with Dr. Koffler – a licensed physician – to have him serve as the nominal owner of a professional medical corporation so that they could incorporate Motion Medical PC to unlawfully submit fraudulent No-Fault billing to GEICO and other No-Fault insurers.

49.    In order to circumvent New York licensing laws and induce the New York State Education Department into issuing a certificate of authority permitting Motion Medical PC to operate as a legitimately controlled healthcare professional corporation, the Management Defendants entered into a secret agreement with Dr. Koffler.

50.   Specifically, in exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Koffler agreed to falsely represent in the Certificate of Incorporation and other related filings with New York State that he was the true shareholder, director, and officer of Motion Medical PC, and that he truly owned, controlled, and practiced medicine through Motion Medical PC.

51.   Dr. Koffler agreed to make these false representations knowing that the professional corporation would be used to submit fraudulent billing to insurers.

52.   In furtherance of the scheme to submit billing for the Fraudulent Services, the Defendants caused Motion Medical PC to be incorporated in August 2019.

53.     Thereafter, the Defendants submitted billing to GEICO for the Fraudulent Services purportedly performed by and through Motion Medical PC.

54.     Although Dr. Koffler has been documented as the record owner of Motion Medical PC on the Certificate of Incorporation and otherwise identified as the licensed professional controlling the professional corporation, Dr. Koffler has never exercised genuine ownership or control over Motion Medical PC.

55.     At all relevant times herein, Dr. Koffler has resided in and spent most of his time in Florida.

56.     Additionally, Dr. Koffler simultaneously has maintained at least six healthcare practices throughout Florida, Connecticut, and New York.

57.     Dr. Koffler has never marketed Motion Medical PC to the general public or made any legitimate efforts of his own to attract patients on behalf of Motion Medical PC.

58.     Dr. Koffler has never examined any patient on behalf of Motion Medical PC.

59.     Dr. Koffler has never rendered any of the actual testing to any patient on behalf of Motion Medical PC.

60.     Dr. Koffler has never visited any of the medical offices where Motion Medical PC purports to provide its testing services to patients.

61.     Dr. Koffler has never discussed any diagnosis, treatment plan, or test results with any Insured or with any of the practitioners who allegedly ordered the Fraudulent Services from Motion Medical PC.

62.     Dr. Koffler has never truly supervised or controlled the operations or management of Motion Medical PC.

63.    The Management Defendants have continuously exercised true ownership and control over Motion Medical PC and have used the façade of Motion Medical PC to engage in actions prohibited by law.

64.    Throughout the course of Dr. Koffler's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Motion Medical PC has been vested entirely with the Management Defendants.

65.    To conceal their true ownership and control of Motion Medical PC while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged for Dr. Koffler to purport to "hire" Sari Rauch as the purported office manager and enter into various bogus "management," "marketing" and/or other financial agreements, including an agreement with Jeffrey Rauch and AHS Management & Marketing.

66.    The financial and other arrangements among Dr. Koffler, Motion Medical PC, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing are not legitimate, arms-length arrangements and call for exorbitant payments from Motion Medical PC to the Management Defendants in amounts that far exceed the fair market value for the alleged performance of the services by them.

67.    In fact, AHS Management & Marketing uses the same building address as Motion Medical and receives substantial monies from Motion Medical PC all while Dr. Koffler has no genuine awareness of the purported particular "marketing" activities allegedly performed by AHS Management & Marketing for Motion Medical PC.

68.    Dr. Koffler has never been the true sole shareholder and owner of Motion Medical PC. True ownership and control over Motion Medical PC has rested at all times entirely with the

Management Defendants, who use the façade of Motion Medical PC to do indirectly what they are forbidden from doing directly, namely to: (i) employ licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from the medical services.

69.     The Management Defendants, solely focused on profit rather than patient care, established predetermined testing protocols employed by Motion Medical PC.

70.     The Management Defendants established the predetermined treatment protocols to facilitate billing for medically unnecessary, illusory and excessive diagnostic testing without regard for the actual medical needs of each individual Insured.

71.     The Management Defendants' ownership and control of Motion Medical PC includes the hiring and firing of employees.

72.     For example, Sari Rauch and Jeffrey Rauch have hired at least two of their immediate family members as employees of Motion Medical PC.

73.     The Management Defendants' ownership and control of Motion Medical PC extends to control over the patient flow to Motion Medical PC.  In fact, Motion Medical PC receives steady volumes of patients through no efforts of Dr. Koffler but rather through illegal kickback relationships established by the Management Defendants that allow Motion Medical PC to access the patient bases already established at the Clinics.

74.     The Management Defendants, rather than Dr. Koffler, determine which Clinics Motion Medical PC operates from.

75.     The Management Defendants direct Motion Medical PC's employees, healthcare professionals, and/or technicians to travel to the Clinic locations to perform the Fraudulent Services.

76.     The Clinics are located at, among others, the following addresses:

- 1 Fulton Avenue, Suite 11, Hempstead
- 1308 Grand Avenue, Baldwin
- 131 Old Country Road, Hicksville
- 1386 Flatbush Avenue, Brooklyn
- 139 North Central Avenue, Valley Stream
- 1570 Old Country Road, Westbury
- 160 Old Country Road, Riverhead
- 17543 Hillside Avenue, Jamaica
- 182 Main Street, Huntington
- 195 Park Avenue, Bethpage
- 2 Coraci Boulevard, Suite 13, Shirley
- 2260 Hewlett Avenue, Merrick
- 255 Broadway Avenue, Lynbrook
- 260 Middle Country Road, Suite 7, Seldon
- 2751 27th Street, Astoria
- 2799 Route 112, Suite 5, Medford
- 2805 Veterans Memorial Highway, Suite 8, Ronkonkoma
- 301 Maple Avenue, Smithtown
- 325 Merrick Avenue, Suite 3, East Meadow
- 333 Broadway, Amityville
- 44-20 Francis Lewis Boulevard, Bayside
- 474 Fulton Avenue, Suite 102, Hempstead
- 535 Broadhollow Road, Melville
- 56A Motor Avenue, Farmingdale
- 740 Veterans Memorial Highway, Suite 210, Hauppauge
- 865 Cypress Avenue, Ridgewood
- 94-11 Jamaica Avenue, Woodhaven

77.     The Management Defendants' decision-making authority also includes control over how the Fraudulent Services are billed to insurers – including GEICO – and who performs the billing services for Motion Medical PC.

78.     The Management Defendants, rather than Dr. Koffler, created and control Motion Medical PC.

79.     The Management Defendants, rather than Dr. Koffler, control the day-to-day operations of Motion Medical PC.

80.     The Management Defendants, rather than Dr. Koffler, control the treatment protocols, financial operations, and financial arrangements of Motion Medical PC, including its profits therefrom.

81.     Dr. Koffler is unaware of fundamental operational aspects of Motion Medical PC, and is unfamiliar with numerous financial transactions appearing in the bank records of Motion Medical PC.

82.     Moreover, Dr. Koffler does not truly control or maintain Motion Medical PC's books or records.

83.     Dr. Koffler does not truly direct and/or control the individuals or entities responsible for handling any aspect of Motion Medical PC's financial affairs.

84.     Dr. Koffler does not have his own patients and does virtually nothing that would be expected of an owner of a legitimate medical professional corporation to develop its reputation and attract patients.

85.     In keeping with the fact that Dr. Koffler has no genuine ownership interest in or control over Motion Medical PC, Dr. Koffler does not actually practice medicine through Motion Medical PC as required by New York law, as further set forth below.

86.     In sum, Dr. Koffler has been nothing more than a *de facto* employee of the Management Defendants, who at all relevant times have remained firmly in control of Motion Medical PC, including its operations, management, testing protocols, financial arrangements, hiring, firing, billing, and profits.

**C.     Dr. Koffler's Failure to Practice Medicine Through Motion Medical PC in Violation of New York Law**

87.     At all relevant times herein, Dr. Koffler has not actually practiced medicine or personally rendered any healthcare services to Insureds through Motion Medical PC.

88.     Instead, the Fraudulent Services allegedly performed and billed through Motion Medical PC have been performed by other employees or independent contractors of Motion Medical PC.

89.     New York Business Corporation Law § 1507 mandates that a licensed professional shareholder of a professional corporation be engaged in the practice of his or her profession through that professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> Issuance of shares
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued…. All shares issued, agreements made, or proxies granted in violation of this section shall be void.

90.     Legislative history confirms that a professional corporation's putative professional-owner not only must be licensed to practice in the profession for which the corporation is authorized, but must also be engaged in the practice of such profession through the professional corporation. For example, in commenting upon the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows

more flexibility in the ownership and transfer of professional service corporation stock, <u>it maintains the basic concept of restricting ownership to professionals working within the corporation</u>. (Emphasis added).

Similarly, the New York Department of State commented that:

Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice <u>and who so practice in such corporation or a predecessor entity</u>. (Emphasis added).

The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

New York's Department of Health was of the same opinion, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations <u>to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged</u>… (emphasis added).

Copies of the memoranda referenced above are collectively annexed hereto as Exhibit "2."

91.     Dr. Koffler has not diagnosed any human disease, pain, injury, deformity or physical condition for any Insured on behalf of Motion Medical PC.

92.     Dr. Koffler has not treated any human disease, pain, injury, deformity or physical condition for any Insured on behalf of Motion Medical PC.

93.     Dr. Koffler has not operated for any human disease, pain, injury, deformity or physical condition for any Insured on behalf of Motion Medical PC.

94.     Dr. Koffler has not prescribed for any human disease, pain, injury, deformity or physical condition for any Insured on behalf of Motion Medical PC.

95.     Dr. Koffler has never discussed any diagnosis, treatment plan, or test results

associated with any Insured with any of the practitioners who allegedly ordered the Fraudulent Services from Motion Medical PC.

96.     Most bills submitted to GEICO through Motion Medical PC purport that Dr. Koffler performed the Fraudulent Services, but Dr. Koffler has never actually performed any of the testing services or rendered any treatment to any of the Insureds on behalf of Motion Medical PC.

97.     Dr. Koffler never actually examined any of the Insureds on behalf of Motion Medical PC.

98.     In fact, Dr. Koffler has never even physically visited the Clinic locations at which Motion Medical PC purportedly performed the Fraudulent Services.

99.     Dr. Koffler has been rarely physically present in the state of New York during the time that Motion Medical PC has operated

100.    At all relevant times herein, Dr. Koffler resided in Florida.

101.    Dr. Koffler's most recently registered residential address is in Surfside, Florida.

102.    Dr. Koffler's driver's license was issued in Florida, and he possesses one or more vehicles registered to his name in Florida.

103.    Dr. Koffler is registered to vote in Florida and most recently voted in 2020 in Florida.

104.    None of bills submitted to GEICO through Motion Medical PC were for services actually rendered by Dr. Koffler.

105.    Rather, to the extent that the Fraudulent Services were truly performed, they were performed by employees, technicians, independent contractors, or others working under the direction and control of the Management Defendants.

**D.**      **The Defendants' Illegal Kickback, Fee-Splitting, and Referral Arrangements**

106.    Although the Clinics ostensibly provide a range of healthcare services to Insureds at a single location for convenience, many of the Clinics where Motion Medical PC operates are actually organized as "one-stop shops" for No-Fault insurance fraud.

107.    Many of the Clinics intentionally host several medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers for the purpose of exploiting Insureds' No-Fault Benefits.

108.    In fact, GEICO has received billing from several Clinics from a "revolving door" of fraudulent healthcare providers, many of which start and stop operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for changes in provider names beyond circumventing insurance company investigations and perpetuating the fraudulent exploitation of New York's No-Fault insurance protections.

109.    For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1570 Old Country Road, Westbury, New York from a "revolving door" of approximately 25 different healthcare providers, including billing from Motion Medical PC for the Fraudulent Services purportedly performed by Dr. Koffler.  GEICO also received billing for services purportedly performed at this Clinic location from Island Medical Diagnostics, PLLC and Integrative Medical Wellness PC, two other professional corporations purportedly "owned" by Dr. Koffler.

110.    Similarly, GEICO has received billing for purported healthcare services rendered

at the Clinic located at 740 Veterans Memorial Highway, Hauppauge, New York from a "revolving door" of approximately 25 different healthcare providers, including billing from Motion Medical PC for the Fraudulent Services purportedly performed by Dr. Koffler.

111.    Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 333 Broadway, Amityville, New York from a "revolving door" of approximately 20 different healthcare providers, including billing from Motion Medical PC for the Fraudulent Services purportedly performed by Dr. Koffler.

112.    The Management Defendants used Motion Medical PC as a vehicle to illegally profit from purported healthcare services performed at several of these Clinics by engaging in unlawful fee-splitting and financial arrangements.

113.    To gain access to Insureds from these Clinics' patient bases, the Defendants caused Motion Medical PC to enter into illegal financial arrangements with persons associated with the Clinics at the direction of the Management Defendants.

114.    These illegal financial arrangements involve the payment of kickbacks and/or "pay-to-play" payments to the owners and controllers of the Clinics in exchange for patient referrals, and/or allowing unlicensed laypersons to share in the professional fees.

115.    As such, the illegal kickbacks and/or "pay-to-play" payments made by the Defendants caused the owners and controllers of the various Clinics to refer their patients to Motion Medical PC so they could be subjected to the medically unnecessary Fraudulent Services, regardless of each patient's individual symptoms, presentment, or need for additional treatment or diagnostic testing.

116.    The Defendants and Motion Medical PC would not have had access to the Clinics

and the Insureds but for the payment of kickbacks, as the Fraudulent Services were medically unnecessary and had no relevance to the patient's individual symptoms, presentment, or need for additional treatment or diagnostic testing.

117.    In fact, the treating practitioners at the Clinics had no need for the Fraudulent Services allegedly performed by Motion Medical PC and the patients' course of  treatment was never altered or changed as a result of the performance of the Fraudulent Services performed by Motion Medical PC.

118.    The Defendants, as well as the owners and controllers of the Clinics, knew that the referrals to Motion Medical PC were made without regard for the necessity of the testing or the Insureds' individual symptoms or presentation.

119.    Indeed, at virtually all of the Clinics, the Insureds had already been subjected to multiple other evaluations, treatments, and diagnostic tests, which rendered the Fraudulent Services performed by Motion Medical PC duplicative, superfluous, and provided solely for financial gain.

120.    To conceal the illegal fee-splitting, kickback, and referral arrangements while simultaneously maintaining pervasive total control over Motion Medical PC's operations, the Management Defendants arranged for Dr. Koffler and Motion Medical PC to enter into various bogus "lease," "marketing" and/or other financial agreements.

121.    For example, the Management Defendants caused Dr. Koffler and Motion Medical PC to enter into a "marketing" agreement with Jeffrey Rauch's corporation, AHS Management & Marketing purportedly for the provision of "marketing services" in exchange for $60,000.00 per contract year.

122.     Illustrative of the fact that the agreement with AHS Management & Marketing was actually a sham, Dr. Koffler was unable to identify any particular marketing events or services provided by AHS Management & Marketing yet Motion Medical PC made payments to AHS Management & Marketing in excess of the contracted amount, totaling at least $117,000.00 in a 17-month period.

123.     In fact, AHS Management & Marketing's purported provision of "marketing services" was a front to conceal the Management Defendants' illegal activities. The Management Defendants actually used AHS Management & Marketing to solicit and establish illegal fee-splitting, kickback, and referral relationships with many of the Clinics and/or other entities to perpetrate their fraudulent scheme and as a vehicle through which the Defendants funneled profits received from their fraudulent scheme.

124.     The Management Defendants also arranged for Dr. Koffler and Motion Medical PC to enter into purported "lease" agreements with Motion Medical PC as a "tenant" with many of the Clinics as "landlord" to disguise the Defendants' illegal kickback payments to each of the Clinics as "rent."

125.     In fact, Motion Medical PC enters into "lease" agreements and makes purported "rent" payments with the Clinics based the volume of patients at the Clinics on whom Motion Medical PC can perform the Fraudulent Services.

126.     In keeping with the fact that the purported "rent" payments are actually illegal kickback and "pay-to-play" payments, the "lease" agreements delineated exorbitant rental amounts for space that was utilized by Motion Medical PC infrequently and was not provided for Motion Medical PC's exclusive use.

127.    For example:

(i)     A "lease" agreement between Island Physical Therapy & Chiropractic PLLC and Motion Medical PC required Motion Medical PC to pay a base rent of $36,000.00 per annum in equal monthly installments of $3,000.00 plus additional rent for space located in 740 Veterans Memorial Highway, Hauppauge, New York. From January 1, 2020 through July 2021, Motion Medical PC generally utilized the space <u>one to two days per month</u> to purportedly perform the Fraudulent Services subsequently billed to GEICO.

(ii)    A "sublease" agreement between NFWC Rental Group, Ltd. and Motion Medical PC required Motion Medical PC to pay a total rent of $17,760.00 per annum in equal monthly installments of $1,480.00 for space and personnel located in 1570 Old Country Road, Westbury, New York. From January 1, 2020 through December 31, 2020, Motion Medical PC generally utilized the space and personnel <u>two to three days per month</u> to purportedly perform the Fraudulent Services subsequently billed to GEICO.

(iii)   A "sublease" agreement between NFWC Rental Group, Ltd. and Motion Medical PC required Motion Medical PC to pay a total rent of $16,620.00 per annum in equal monthly installments of $1,385.00 for space and personnel located in 56A Motor Avenue, Farmingdale, New York. From January 1, 2020 through December 31, 2020, Motion Medical PC generally utilized the space and personnel <u>one to three days per month</u> to purportedly perform the Fraudulent Services subsequently billed to GEICO.

(iv)    A "lease" agreement between Sunrise Chiropractic & Wellness and Motion Medical PC required Motion Medical PC to pay a base rent of $30,000.00 per annum in equal monthly installments of $2,500.00 plus additional rent for space located in 2260 Hewlett Avenue, Merrick, New York. From October 1, 2019 through July 2021, Motion Medical PC generally utilized the space <u>one to three days per month</u> to purportedly perform the Fraudulent Services subsequently billed to GEICO.

(v)     A "lease" agreement between Yellowstone Medical and Motion Medical PC required Motion Medical PC to pay a base rent of $30,000.00 per annum in equal monthly installments of $2,500.00 plus additional rent for space located in 94-11 Jamaica Avenue, Woodhaven, New York. From October 1, 2019 through July 2021 Motion Medical PC generally utilized the space <u>zero to three days per month</u> to purportedly perform the Fraudulent Services subsequently billed to GEICO.

128.    These "lease" arrangements ensured a steady stream of patients that could be

subjected to the Fraudulent Services rendered, or purported to be rendered, by Motion Medical PC.

129.     Dr. Koffler – like the Management Defendants – knows that these arrangements are illegal and is therefore complicit in taking affirmative steps to conceal the existence of the fraudulent kickback, "pay-to-play," and referral payments.

130.     The unlawful kickback, "pay-to-play" payments, and referral arrangements are essential to the success of the Defendants' fraudulent scheme, and they derive significant financial benefit from these arrangements. Without access to Insureds, the Defendants would not have the opportunity to execute the fraudulent testing and billing protocols and bill GEICO and other insurers for the Fraudulent Services.

**E.     The Defendants' Fraudulent Treatment and Billing Protocols**

131.     The Defendants implemented fraudulent testing and billing protocols without regard to the genuine, individual medical needs of the Insureds as part of their scheme to submit fraudulent charges through Motion Medical PC in purposeful circumvention of the billing restrictions and prohibitions applicable to the Fraudulent Services as promulgated in the Fee Schedule.

132.     Each patient that has, or is in, an accident, including motor vehicle accidents, is exposed to a unique mechanical event and their injuries are a direct result of those specific forces, hence their injuries are unique.

133.     Virtually none of the Insureds involved in a vehicular accident who treated with Motion Medical PC presented with injuries and health problems identical to those of another Insured. Even so, the Defendants purported to subject each Insured to substantially the same,

medically unnecessary Fraudulent Services pursuant to predetermined, fraudulent protocols.

134.    The Fraudulent Services were purportedly rendered regardless of the nature of the accidents, the actual medical needs of the Insureds, or the Insureds' individual symptoms or presentment.

135.    Following the purported rendering of the Fraudulent Services on each Insured, the Defendants fraudulently billed GEICO through Motion Medical PC.

136.    The Defendants' fraudulent protocols were designed to maximize the billing that they submitted or caused to be submitted to GEICO through Motion Medical PC, rather than to treat or otherwise benefit the Insureds.

137.    The charges submitted to GEICO through Motion Medical PC were fraudulent in that: (i) the ROM/MT was duplicative, illusory, and medically unnecessary; (ii) the ROM/MT was performed – to the extent performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocols and the improper referral and financial arrangements between and among the Defendants and many of the Clinics; (iii) for ROM/MT purportedly performed prior to October 1, 2020, the Defendants unbundled the billing for the ROM/MT to fraudulently inflate the charges by an order of magnitude; and (iv) for ROM/MT purportedly performed on or after October 1, 2020, the Defendants fraudulently appropriated a billing code to collect payments on non-reimbursable ROM/MT in order to circumvent the reimbursement restrictions and prohibitions applicable to ROM/MT as set forth in the Fee Schedule.

138.    The Defendants established the fraudulent testing and billing protocols described below because they sought to illegally profit from the fraudulent billing submitted to GEICO and other insurers.

      **i.**      **The Fraudulent Range of Motion and Muscle Strength Testing**

139.    The Defendants subjected virtually every Insured referred to Motion Medical PC to duplicative, illusory, and medically unnecessary ROM/MT regardless of their individual medical needs in order to maximize the fraudulent billing submitted for each insured.

      **a.**      **Traditional Tests to Evaluate Range of Motion and Muscle Strength**

140.    The adult human body is composed of 206 bones joined at various joints that allow motion between body parts. These motions include but are not limited to flexion, extension, side-bending and rotation.

141.    The measurement of the capacity of a particular joint to move through its full physiological motion is referred to as that joint's "range of motion."

142.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired, healthy joint. In a traditional range of motion test, the limb is moved passively by the patient or actively by the evaluating practitioner. Evaluation of the patient's range of motion of various joints is measured either by sight or through the use of a manual inclinometer and/or a goniometer (i.e., devices used to measure angles).

143.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move a particular joint in a particular motion against manual resistance applied by the evaluating practitioner. For example, if the evaluating practitioner wanted to measure muscle strength in the muscles that flex or surround a patient's knee, he/she would apply resistance against the appropriate motion.

144.    Thorough physical evaluations performed on patients with soft-tissue trauma

include ROM/MT, inasmuch as these tests provide a point of reference for joint motion, injury assessment, and treatment planning. Unless the evaluating practitioner knows the extent of a given patient's joint mobility or muscle strength impairment, the evaluating practitioner will be substantially limited in his/her ability to properly diagnose or treat the patient's injuries and assess their response to treatment. Evaluation of range of motion and muscle strength are essential components of the thorough evaluation of a patient.

145.    Since ROM/MT is conducted as an element of a soft-tissue trauma patient's initial examination, as well as during virtually all follow-up examinations, the Fee Schedule provides that ROM/MT is to be reimbursed as a component of the initial and follow-up examinations.

146.    Alternatively stated, healthcare practitioners cannot conduct and bill for initial examinations and follow-up examinations which include ROM/MT, then bill separately for duplicative, contemporaneously provided ROM/MT.

**b.    The Defendants' Range of Motion and Muscle Strength Testing was Duplicative and Medically Unnecessary**

147.    To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Clinics that were billed to GEICO, the Insureds received manual range of motion tests and manual muscle strength tests during those examinations.

148.    The charges submitted to GEICO for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the healthcare practitioners at the Clinics routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

149.    Despite the fact that the Defendants knew that the Insureds had already undergone manual range of motion testing and manual muscle strength testing during their initial

examinations and follow-up examinations, the Defendants systematically billed for, and purported to provide, duplicative, illusory, and medically unnecessary ROM/MT to Insureds.

150.    The Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insured's body while the Insured was asked to attempt various motions and movements. The computerized test was virtually identical to the traditional, manual range of motion testing performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the practitioner manually documenting the Insured's range of motion.

151.    The Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to flex, extend, or rotate three to four separate times using specific muscle groups that effectuate emotion at the joint tested.  As with the computerized range of motion tests, the computerized muscle strength test was virtually identical to the traditional, manual muscle strength testing performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the practitioner manually documenting the Insured's muscle strength.

152.    The information learned through the use of the computerized ROM/MT offered no clinical advantage over the information obtained through the traditional, manual ROM/MT that was an essential component of each Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was medically meaningless, and never resulted in a change in the patient's

treatment plan.

153.    While ROM/MT can be a medically useful tool as part of research, under the circumstances employed by the Defendants, it represented purposeful and unnecessary duplication of the manual ROM/MT conducted during virtually every Insured's initial and follow-up examinations with a physician.

154.    Further to the point that the ROM/MT purportedly performed by the Defendants was medically noncontributory, the results of the ROM/MT purportedly performed by and through Motion Medical PC were typically not reviewed by the treating practitioner, adding to the ROM/MT's failure to provide any diagnostic value.

155.    The results of the ROM/MT purportedly performed by and through Motion Medical PC were virtually never discussed with the treating practitioner.

156.    The results of the ROM/MT purportedly performed by and through Motion Medical PC were virtually never evident in the treating practitioner's medical notes.

157.    The results of the ROM/MT purportedly performed by and through Motion Medical PC were virtually never used to alter or change the patients' course of a treatment.

158.    The Defendants rendered the ROM/MT pursuant to a preestablished protocol that: (i) did not aid in the assessment and/or treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

>    **ii.    The Fraudulent Range of Motion and Muscle Strength Testing Billing Protocol**

159.    Not only did the Defendants deliberately purport to provide duplicative, medically unnecessary ROM/MT, but they also fraudulently billed for the purported provision of the Fraudulent Services to maximize profits by: (i) unbundling charges for the Fraudulent Services

purportedly rendered before October 1, 2020; and (ii) improperly billing for the non-reimbursable Fraudulent Services purportedly rendered on or after October 1, 2020 under an alternative CPT code.

160.    The Defendants fraudulently represented that they satisfied the requirements prescribed by CPT guidelines in that they, among other things: (i) included signed, written reports interpreting the results of the ROM/MT purportedly performed when billing such services under CPT codes 95831 and 95851; and (ii) rendered ROM/MT services appropriate for billing under CPT code 99456.

161.    In actuality, the Defendants billed GEICO and other No-Fault insurers pursuant to a predetermined protocol designed to circumvent the reimbursement restrictions and prohibitions applicable to the Fraudulent Services as promulgated in the Fee Schedule and maximize profits for their own financial enrichment.

> **a.    The Defendants Fraudulently Unbundled Charges for Range of Motion and Muscle Strength Testing Purportedly Rendered Before October 1, 2020**

162.    For ROM/MT purportedly performed prior to October 1, 2020, the Defendants intentionally unbundled their billing in order to maximize the fraudulent charges that they submitted to GEICO through Motion Medical PC.

163.    Pursuant to the Fee Schedule in effect for services rendered prior to October 1, 2020, when multiple units of ROM/MT were performed on the same date of service, all such testing should have been reported and billed under CPT code 97750.

164.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes," identified a number

of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests included services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also included the creation of a written report.

165.     CPT code 97750 was a "time-based" code that – in the New York metropolitan area – allowed for a single charge of $45.71 for every 15 minutes of testing performed. Thus, if a provider performed 15 minutes of ROM/MT, it was permitted a single charge of $45.71 for the ROM/MT under CPT code 97750. If the provider performed 30 minutes of ROM/MT, it was permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

166.     The Defendants routinely purported to provide multiple units of ROM/MT to an individual Insured on the same date of service.

167.     To the extent that the Defendants actually provided the ROM/MT to those Insureds, the computerized ROM/MT – together – never took more than 15 minutes to perform. Thus, even if the ROM/MT purportedly performed by Defendants was medically necessary, the Defendants would have been limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

168.     In order to maximize their fraudulent billing for the computerized ROM/MT purportedly performed before October 1, 2020, the Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized ROM/MT into: (i) multiple charges of $45.75 under CPT code 95851 (for range of motion tests); and (ii)

multiple charges of $43.60 under CPT code 95831 (for muscle strength tests).

169.   By unbundling what should – at most – have been a single of $45.71 under CPT code 97750 into multiple charges under CPT codes 95851 and 95831, the Defendants inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude.

170.   Specifically, for the Fraudulent Services purportedly performed prior to October 1, 2020, the Defendants regularly submitted billing for multiple units of ROM/MT rendered to an Insured on a single date of service totaling more than $950.00.  The bills often consist of 12 units of duplicative, medically unnecessary computerized range of motion testing under CPT code 95851 and 10 units of duplicative, medically unnecessary computerized muscle strength testing under CPT code 95831.

> **b.**   **The Defendants Fraudulently Misrepresented the Existence of Written, Interpretive Reports Pertaining to the Range of Motion and Muscle Strength Testing as Required Under CPT Codes 95831 and 95851**

171.   Not only were the Defendants' charges for the ROM/MT fraudulent because the tests were duplicative, medically unnecessary, and because the billing for the Fraudulent Services purportedly rendered before October 1, 2020 was fraudulently unbundled, but the charges were also fraudulent because they falsely represented that the Defendants prepared written reports interpreting the test results from the Fraudulent Services.

172.   Pursuant to the Fee Schedule in effect for services rendered prior to October 1, 2020, when a healthcare provider submitted a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle strength testing using CPT code 95831, the provider represented that it had prepared a written report interpreting the data obtained from the ROM/MT.

173.    The CPT Assistant stated that "[i]nterpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting [CPT] codes 95851 and 95852."

174.    The CPT Assistant also stated that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle strength testing.

175.    Thus, a report containing little more than the results obtained from ROM/MT was insufficient to meet the standards of an interpretation of the results as described in the CPT Assistant.

176.    Though the Defendants routinely submitted billing for computerized ROM/MT using CPT codes 95831 and 95851, the Defendants did not prepare written reports interpreting the data obtained from the tests.

177.    To the extent Defendants included any written information accompanying the ROM/MT results, such information was limited to generic procedural explanations and boilerplate medical necessity of the ROM/MT performed, but did not include interpretation of the test results.

178.    Therefore, even if the Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT codes 95831 and 95851 – and they did not – the Defendants' billing still would not be in compliance with the Fee Schedule due to their failure to submit a separate, distinctly identifiable, and signed written report addressing the individualized deficits as they relate to the injuries sustained and the required treatment for each patient.

179.    The Defendants did not prepare individualized written reports interpreting the data

obtained from the Fraudulent Services because the tests were not intended to impact any Insured's

course of treatment. Rather, to the extent they were performed at all, the ROM/MT was performed

as part of the Defendants' predetermined fraudulent testing and billing protocol and was designed

solely to financially enrich the Defendants at the expense of the Insureds and No-Fault insurers,

including GEICO.

> **c.     The Defendants Fraudulently Submitted Charges Under an Inappropriate CPT Code to Circumvent the Fee Schedule's Reimbursement Restrictions and Prohibitions for Range of Motion and Muscle Strength Testing Purportedly Rendered on or After October 1, 2020**

180.    Not only did the Defendants deliberately purport to provide duplicative, medically

unnecessary ROM/MT for which they unbundled the billing and failed to meet the interpretive

reporting requirements, but when reimbursement values for CPT codes 95831 and 95851 were

eliminated by the Fee Schedule for ROM/MT performed on or after October 1, 2020, the

Defendants also knowingly and fraudulently utilized an inappropriate billing code to charge

GEICO for the Fraudulent Services in purposeful circumvention of the Fee Schedule's

reimbursement restrictions and prohibitions on ROM/MT.

181.    In 2018, the American Medical Association's Relative Value Update Committee

("RUC") made recommendations to the Centers for Medicare & Medicaid Services ("CMS")

regarding the relative value units ("RVU") (i.e., reimbursement rates) for several CPT codes,

including CPT code 95831 which covers muscle strength testing.

182.    In its May 2018 recommendation to permanently delete CPT code 95831, the RUC

reported that various medical groups "do not believe that there is an appropriate scenario for

physicians to separately report manual muscle testing." In other words, muscle strength testing is

performed as an inherent element of a patient's initial and follow-up examinations and should not be billed as a separate procedure under CPT code 95831.

183.    Additionally, the RUC noted in another recommendation to the CMS that most Medicare claims for CPT code 95831 were being reported from one geographic location, concluding that there was "possible inappropriate reporting of CPT code 95831." In other words, the billing code used for muscle strength testing was subject to fraud and abuse.

184.    In line with these recommendations, CPT code 95831 was subsequently deleted from the American Medical Association's 2020 Current Procedural Terminology code set.

185.    Not only did the New York State Workers' Compensation Board also adopt the changes in its Fee Schedule insofar as it reduced the RVU for CPT code 95831 to $0.00, but it likewise reduced the RVUs for CPT codes 95851 (for range of motion testing) and 97750 (the "time-based" code for ROM/MT) to $0.00, effectively eliminating these codes and prohibiting reimbursement for ROM/MT. These changes became effective in the Fee Schedule on October 1, 2020 for ROM/MT performed on or after that date (the "Revised Fee Schedule").

186.    Despite the Revised Fee Schedule's reimbursement prohibition on ROM/MT, the Defendants continued to purportedly perform ROM/MT and bill GEICO for the Fraudulent Services from October 2020 through the present pursuant to their predetermined testing and billing protocol.

187.    On or about October 1, 2020, Defendants ceased billing GEICO for ROM/MT under CPT codes 95831 and 95851, and  knowingly and fraudulently began using CPT code 99456 to continue to bill GEICO for substantially the same ROM/MT that they performed prior to the restrictions imposed by the Revised Fee Schedule. The Defendants did so to maximize the

fraudulent charges that they could submit to GEICO through Motion Medical PC and to obtain reimbursement to which they were not entitled.

188.    CPT code 99456 permits reimbursement for a "[w]ork related or medical disability examination by other than a treating physician." Such an examination must include the: (i) completion of a medical history commensurate with the patient's condition; (ii) performance of an examination commensurate with the patient's condition; (iii) formulation of a diagnosis, assessment of capabilities and stability, and calculation of impairment; (iv) development of a future medical treatment plan; and (v) completion of necessary documentation/certificates and report.

189.    Despite the Defendants routinely billing GEICO under CPT code 99456 for ROM/MT they characterized as "Disability Impairment Assessments," the "Disability Impairment Assessments" purportedly performed by Defendants consisted primarily of ROM/MT not substantially different from the ROM/MT purportedly performed by Defendants prior to October 1, 2020, apart from a minimal, superficial form "report" and "orthopedic tests" appended to the ROM/MT data. These additions failed to meaningfully differentiate the ROM/MT from that which was previously performed, nor were they sufficient to meet the context and examination requirements set forth under CPT code 99456.

190.    The "Disability Impairment Assessments" purportedly rendered to Insureds by the Defendants failed to adhere to the requirements of CPT code 99456 because: (i) the "Disability Impairment Assessments" were performed on virtually every Insured for "certification of the injuries determined to date" and to "establish a baseline of functionality and impairment to be compared to future studies" rather than to establish baseline information for life or disability

insurance certification in a work-related context; (ii) the actual examination purportedly performed on each Insured was substantially identical across and among virtually every Insured, thus they did not constitute examinations commensurate with each patient's unique conditions and medical needs; and (iii) the attached "report" and "orthopedic tests" utilized generic, boilerplate language that failed to constitute a meaningful formulation of a diagnosis, assessment of capabilities and stability, calculation of impairment, and development of a future medical treatment plan.

191.    By billing to GEICO what should not have been billed under CPT code 99456 instead of completely ceasing to bill for ROM/MT in compliance with the Revised Fee Schedule, the Defendants fraudulently collected and/or intended to collect reimbursement from GEICO for otherwise non-reimbursable ROM/MT.

192.    Specifically, for "Disability Impairment Assessments" consisting primarily of non-reimbursable ROM/MT purportedly rendered to Insureds on or after October 1, 2020, the Defendants regularly submitted charges of $685.00 for each patient's initial appointment and $585.00 for each follow-up appointment.

193.    Illustrative of the Defendants' fraudulent billing protocol is the fact that a multitude of Insureds who were subjected to ROM/MT by Defendants prior to October 1, 2020 were also subjected to "Disability Impairment Assessments" on or after October 1, 2020. In each of these instances, the Defendants fraudulently submitted unbundled charges to GEICO under CPT codes 95831 and 95851 for ROM/MT purportedly performed prior to October 1, 2020, and fraudulently billed GEICO under CPT code 99456 for substantially the same ROM/MT disguised as a "Disability Impairment Assessment" purportedly performed on or after October 1, 2020.

194.    For example:

(i)     On May 12, 2020, June 16, 2020, and October 6, 2020, an Insured named EE was purportedly provided with computerized ROM/MT at the Clinic located at 44-20 Francis Lewis Boulevard, Bayside, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the two dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the date of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00.

(ii)    On July 16, 2020, September 10, 2020, November 5, 2020, December 29, 2020, and March 4, 2021, an Insured named CS was purportedly provided with computerized ROM/MT at the Clinic located at 94-11 Jamaica Avenue, Woodhaven, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the two dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the three dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the November 5, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(iii)   On June 23, 2020, July 21, 2020, November 5, 2020, February 25, 2021, and April 29, 2021, an Insured named EK was purportedly provided with computerized ROM/MT at the Clinic located at 2260 Hewlett Avenue, Merrick, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the two dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the three dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the November 5, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(iv)    On August 17, 2020, September 21, 2020, November 23, 2020, December 21, 2020, and January 18, 2021, an Insured named KK was purportedly provided with computerized ROM/MT at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the two dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment"

on the three dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the November 23, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(v)     On July 16, 2020, August 12, 2020, September 8, 2020, November 10, 2020, January 12, 2021, February 9, 2021, March 9, 2021, April 13, 2021, May 11, 2021, and June 8, 2021, an Insured named AG was purportedly provided with computerized ROM/MT at the Clinic located at 44-20 Francis Lewis Boulevard, Bayside, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the three dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the seven dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the November 10, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(vi)    On July 1, 2020, July 29, 2020, October 26, 2020, December 10, 2020, and March 22, 2021, and July 16, 2021, an Insured named FT was purportedly provided with computerized ROM/MT at the Clinic located at 255 Broadway, Lynbrook, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the two dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the four dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the October 26, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(vii)   On March 11, 2020, May 12, 2020, June 16, 2020, July 16, 2020, August 12, 2020, October 6, 2020, November 10, 2020, January 12, 2021, and February 9, 2021, an Insured named DW was purportedly provided with computerized ROM/MT at the Clinic located at 44-20 Francis Lewis Boulevard, Bayside, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the five dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the four dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the October 6, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(viii)   On September 3, 2020, November 11, 2020, January 7, 2021, February 4, 2021, and April 1, 2021, an Insured named VL was purportedly provided with computerized ROM/MT at the Clinic located at 474 Fulton Avenue, Suite 102, Hempstead, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the date of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the four dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the November 11, 2020 appointment, and a total of $585.00 for each appointment thereafter.

(ix)   On February 7, 2020, March 6, 2020, June 19, 2020, October 2, 2020, and November 6, 2020, an Insured named AL was purportedly provided with computerized ROM/MT at the Clinic located at 131 Old Country Road, Hicksville, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the three dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the two dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 per appointment.

(x)   On October 28, 2019, November 25, 2019, January 15, 2020, September 28, 2020, March 22, 2021, April 19, 2021, May 20, 2021, and July 8, 2021, an Insured named PT was purportedly provided with computerized ROM/MT at the Clinic located at 255 Broadway, Lynbrook, which was billed through Motion Medical PC. For the ROM/MT purportedly performed on the four dates of service prior to October 1, 2020, Defendants billed GEICO under CPT codes 95851 and 95831 for a total of $985.00 per appointment. For substantially the same ROM/MT purportedly performed as a "Disability Impairment Assessment" on the four dates of service after October 1, 2020, Motion Medical PC billed GEICO under CPT Code 99456 for a total of $685.00 for the March 22, 2021 appointment, and a total of $585.00 for each appointment thereafter.

195.   In sum, the Defendants fraudulently submitted billing under CPT code 99456 to conceal the fact that they continued to bill GEICO for ROM/MT in purposeful circumvention of the reimbursement restrictions and prohibitions applicable to ROM/MT in the Revised Fee Schedule. In doing so, the Defendants compromised individualized, genuine patient care,

defrauded GEICO and other No-Fault insurers, and exploited New York's No-Fault protections.

### III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

196.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills, NF-3s, HCFA-1500 forms, and/or treatment reports through Motion Medical PC to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

197.    The bills, NF-3s, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The bills, NF-3s, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that Motion Medical PC is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, Motion Medical PC is not properly licensed in that it is controlled by non-physicians and has a nominal physician-owner who does not practice medicine through the professional corporation.

(ii)    The bills, NF-3s, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that Motion Medical PC is lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, Motion Medical PC engaged in illegal fee-splitting, kickback, and referral arrangements.

(iii)   The bills, NF-3s, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were actually performed, and that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services are not medically necessary and are performed as part of a predetermined fraudulent testing and billing protocol designed solely to financially enrich the Defendants, rather than to genuinely address the medical needs of the Insureds.

(iv)    The bills, NF-3s, HCFA-1500 forms, and treatment reports uniformly misrepresented and exaggerated the level of service and the nature of the service that was purportedly provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

198.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

199.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

200.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that Motion Medical PC was in violation of licensing laws and engaged in illegal fee-splitting and kickback arrangements, and therefore are ineligible to bill for or collect No-Fault Benefits.

201.    For example, the Defendants misrepresented ownership of and control over Motion Medical PC in filings with the New York State Department of Education ("DOE"), so as to (i) induce the DOE to issue the licenses required to permit Motion Medical PC to engage in the practice of a licensed profession; (ii) induce the DOE to continue to recognize Motion Medical PC as being legally organized and authorized to practice its respective profession; and/or (iii) induce the DOE to allow Dr. Koffler to continue to lawfully practice his profession, despite the control of his license by unlicensed laypersons.

202.    The Defendants also entered into various financial arrangements between and among Motion Medical PC and the Clinics that were designed to, and did, conceal their true ownership of and control over Motion Medical PC, as well as their unlawful referral arrangements and illegal fee-splitting.

203.    Furthermore, the billing and supporting documentation submitted by the

Defendants for the Fraudulent Services, when viewed in isolation, does not reveal its fraudulent nature.

204.    The Defendants further fraudulently billed GEICO, after October 1, 2020, by disguising as a "Disability Impairment Assessment" their billing for substantially the same ROM/MT billed previously, in order to circumvent the changes to the Fee Schedule.

205.    The Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were duplicative, medically unnecessary, illusory, and otherwise non-reimbursable and were performed pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted to GEICO rather than to benefit the Insureds who were subjected to them.

206.    In every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level and nature of the services purportedly provided, inflated the billing to GEICO, and otherwise billed GEICO for non-reimbursable services.

207.    In furtherance of the fraudulent scheme, the Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

208.    In accordance with the No-Fault Laws and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the Defendants,

and, therefore, GEICO's time to pay or deny the claims has not yet expired.

209. GEICO is under statutory and contractual obligation to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $702,900.00 based upon the fraudulent charges.

210. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment-28 U.S.C. §§ 2201 and 2202)

211. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

212. There is an actual case in controversy between GEICO and the Defendants regarding more than $2,230,000.00 in pending fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the name of Motion Medical PC.

213. The Defendants have no right to receive payment for any pending bills submitted to GEICO on behalf of Motion Medical PC because the Fraudulent Services billed are not medically necessary and are provided – to the extent provided at all – pursuant to predetermined fraudulent testing and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who were purportedly subjected to them.

214. The Defendants have no right to receive payment for any pending bills submitted to

GEICO on behalf of Motion Medical PC because Motion Medical PC is fraudulently incorporated, unlawfully controlled by unlicensed laypersons and, therefore, ineligible to bill for or to collect No-Fault Benefits.

215.   The Defendants have no right to receive payment for any pending bills submitted to GEICO on behalf of Motion Medical PC because the Defendants engage in illegal fee-splitting and kickback arrangements and, therefore, Motion Medical PC is ineligible to bill for or to collect No-Fault Benefits.

216.   The Defendants have no right to receive payment for any pending bills submitted to GEICO on behalf of Motion Medical PC because the billing codes used for the Fraudulent Services misrepresent and exaggerate the level of services that are purportedly provided in order to inflate the charges submitted to GEICO and otherwise bill for non-reimbursable services in circumvention of the reimbursement restrictions and prohibitions in the Fee Schedule.

217.   The Defendants have no right to receive payment for any pending bills submitted to GEICO on behalf of Motion Medical PC because the alleged owner of Motion Medical PC does not practice through the professional corporation as physician-owners are required to do under New York law and, therefore, Motion Medical PC is ineligible to bill for or to collect No-Fault Benefits.

218.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i)   the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Motion Medical PC because the Fraudulent Services are medically unnecessary and ordered pursuant to fraudulent, predetermined protocols designed solely to maximize charges to GEICO and other insurers, not because they are medically necessary or

designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them;

(ii) the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Motion Medical PC because Motion Medical PC is unlawfully owned and controlled by non-physicians and illegally shares fees with them and, therefore, is ineligible to bill for or to collect No-Fault Benefits;

(iii) the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Motion Medical PC because Motion Medical PC engages in illegal fee-splitting, kickback, and referral arrangements and, therefore, is ineligible to bill for or to collect No-Fault Benefits;

(iv) the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Motion Medical PC because the CPT codes used for the Fraudulent Services misrepresent and exaggerate the level of services that purportedly are provided in order to inflate the charges submitted to GEICO and otherwise bill GEICO for non-reimbursable services in circumvention of the reimbursement restrictions and prohibitions in the Fee Schedule; and

(v) the Defendants have no right to receive payment for any pending bills submitted to GEICO because the alleged owner of Motion Medical PC does not practice through the professional corporation as physician-owners are required to do under New York law and, therefore, Motion Medical PC is ineligible to bill for or to collect No-Fault Benefits.

## <u>SECOND CAUSE OF ACTION</u>
### Against Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing
### (Violation of RICO, 18 U.S.C. § 1962(c))

219. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

220. Motion Medical PC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

221. Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing knowingly have conducted and/or participated, directly or indirectly, in the conduct of Motion

Medical PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Motion Medical PC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by unlicensed laypersons and had a nominal physician-owner who did not practice medicine through the professional corporation; (ii) it engaged in unlawful referral and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary, were not provided for genuine patient care, and were performed and billed pursuant to a predetermined, fraudulent testing and billing protocol designed solely to enrich the Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

222.    Motion Medical PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing operated Motion Medical PC, inasmuch as Motion Medical PC never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Motion Medical PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the

fact that Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing continue to attempt collection on the fraudulent billing submitted through Motion Medical PC to the present day.

223.    Motion Medical PC is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Motion Medical PC likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Motion Medical PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

224.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $702,900.00 pursuant to the fraudulent bills submitted by Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing through Motion Medical PC.

225.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

226.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

227.    Motion Medical PC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

228.    Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing are employed by and/or associated with the Motion Medical PC enterprise.

229.    Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Motion Medical PC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Motion Medical PC was not eligible to receive under the No-Fault Laws because: (i) it was owned and controlled by unlicensed laypersons and had a nominal physician-owner who did not practice medicine through the professional corporation; (ii) it engaged in unlawful referral and fee-splitting arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for-services were not medically necessary, were not provided for genuine patient care, and were performed and billed pursuant to a predetermined, fraudulent testing  and billing protocol designed solely to enrich the Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and

corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

230.    Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

231.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $702,900.00 pursuant to the fraudulent bills submitted by Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing through Motion Medical PC.

232.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against All Defendants**
**(Common Law Fraud)**

233.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

234.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

235.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Motion Medical PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons, and which had a nominal physician-owner who did not practice medicine through the professional corporation; (ii) in every claim, the representation that Motion Medical PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting, kickback, and referral arrangements; (iii) in every claim, the representation that the billed for services were medically necessary, when in fact the billed for services were not medically necessary or reimbursable and – to the extent that they were performed at all – were provided and billed pursuant to predetermined, fraudulent protocols designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that was purportedly provided.

236.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Motion Medical PC that were not compensable under the No-Fault laws.

237.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $702,900.00 pursuant to the fraudulent bills submitted by the Defendants through Motion Medical PC.

238.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

239.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief that the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

240.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

241.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

242.     When GEICO paid the bills and charges submitted by or on behalf of Motion Medical PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

243.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

244.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

245.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $702,900.00

### JURY DEMAND

246.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A. On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Motion Medical PC has no right to receive payment for any pending bills, totaling approximately $2,230,000.00 submitted to GEICO;

B. On the Second Cause of Action against Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing, compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $702,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Dr. Koffler, Sari Rauch, Jeffrey Rauch, and AHS Management & Marketing, compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $702,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $702,900.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

E. On the Fifth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in no event less than $702,900.00, together with costs, interest and such other and further relief as this Court deems just and proper.

Dated:  October 21, 2021
      Uniondale, New York

                             RIVKIN RADLER LLP

                       By: */s/ Michael A. Sirignano*
                           Barry I. Levy
                           Michael A. Sirignano
                           Sean Gorton
                  926 RXR Plaza
                  Uniondale, New York 11556
                  (516) 357-3000
                  *Counsel for Plaintiffs Government Employees*
                  *Insurance Company, GEICO Indemnity Company,*
                  *GEICO General Insurance Company, and GEICO*
                  *Casualty Company*